UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

TRACY J. KARL-LEBRENZ,

                      Plaintiff,

                **REPORT AND RECOMMENDATION**

     v.

                12-CV-01099-A

CAROLYN W. COLVIN,[1]
COMMISSIONER OF SOCIAL SECURITY,

                    Defendant.

## I.   INTRODUCTION

      The Hon. Richard J. Arcara referred this case to this Court under 28 U.S.C. § 636(b) (text order, Feb. 13, 2013). Pending before the Court are cross-motions for judgment on the pleadings by plaintiff Tracy J. Karl-Lebrenz ("Karl-Lebrenz") (Dkt. No. 12) and the Commissioner of Social Security ("Commissioner") (Dkt. No. 11). Karl-Lebrenz argues that the Commissioner erred in finding that her physical impairments did not meet the criteria for disability under 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A. Karl-Lebrenz argues further that the Commissioner erred when she determined that her mental impairments were not severe. Additionally, Karl-Lebrenz argues that the Commissioner did not offer suitable explanations for giving little weight to the testimony of Dr. Tera Storms, Dr. Raja Rao, Dr. Edward Simmons, or Dr. Jan Hendryx. Karl-Lebrenz also argues that the record lacks evidentiary support for a decision that she has the

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, the Clerk of the Court is directed to substitute Carolyn W. Colvin for Michael J. Astrue as Commissioner of Social Security.

Residual Functional Capacity to perform light work, and that the Commissioner's reliance on and application of the Medical-Vocational Guidelines was improper in light of evidence indicating that she has non-exertional impairments. Finally, Karl-Lebrenz argues that the Commissioner failed to provide adequate reasoning for finding her testimony not credible. The Commissioner responds that Karl-Lebrenz did not meet her burden of satisfying all of the criteria for Listing 1.04A, disability due to Disorders of the Spine; that Karl-Lebrenz's mental impairments were correctly determined to be non-severe according to the "special technique" laid out at 20 C.F.R. § 404.1520a of the regulations for evaluating the severity of mental impairments; that proper consideration and weight was given to the opinions of Karl-Lebrenz's treating sources; and that her reliance on the Medical-Vocational Guidelines was proper in this case.

The Court has deemed the motions submitted on papers under Rule 78(b) of the Federal Rules of Civil Procedure. For the reasons below, the Court respectfully recommends granting Karl-Lebrenz's motion (Dkt. No. 12) in part, vacating the Commissioner's determination, and remanding the case for the purpose of completing the medical record and for reassessment of mental and physical disability. The Court recommends denying Karl-Lebrenz's motion without prejudice to the extent that it seeks any other relief. The Court further recommends denying the Commissioner's motion (Dkt. No. 11).

## II.   BACKGROUND

### A. *Procedural History*

Karl-Lebrenz applied for disability insurance benefits under the Social Security Act on September 3, 2008, claiming a disability that began on March 8, 2003. (Certified Administrative Record at 190, hereinafter designated as [190].) Karl-Lebrenz stated that she was unable to work

because of chronic neck and upper back pain, radiating into her arms, legs, hands, and feet; an inability to lift; tingling in her hands, causing her to drop things; regular headaches; depression; anxiety; and memory problems. [195.] Karl-Lebrenz's claim was denied on October 21, 2008. [68.] On October 27, 2008, Karl-Lebrenz requested a hearing by an Administrative Law Judge ("ALJ"). [80.] Before a hearing was conducted, Karl-Lebrenz's attorney provided a brief summarizing her claim. [121.] The brief explains that Karl-Lebrenz's cervical spine was injured in a motor vehicle accident, because of which she underwent spinal surgery. [122.] Karl-Lebrenz's attorney goes on to list the following alleged impairments: fibromyalgia; reduced range of motion of the cervical spine; inability to perform repetitive motions; chronic cervical pain syndrome; ADHD; lumbago; thoracic pain; cervicalgia; post-laminectomy syndrome; sensory polyneuropathy; Major Depressive Disorder; and Dysthymic Disorder. [122-124.] The hearing occurred on November 3, 2010, before ALJ William Weir. [27.] On March 31, 2011, the ALJ denied the claim in a written decision. [11.] Karl-Lebrenz filed a request for the Appeals Council to review the ALJ's decision on May 3, 2011. [7.] On September 11, 2012, the Appeals Council denied the request to review the ALJ's decision. [1.] Karl-Lebrenz commenced this case by filing a Complaint on November 8, 2012. (Dkt. No. 1.)

## B. *Factual and Medical Background*

Karl-Lebrenz was born on August 11, 1956, and was forty-six years old on March 8, 2003, the alleged onset date of her disability. [62.] Because the date of her fiftieth birthday, August 11, 2006, fell within the relevant period, she was initially considered as a younger individual and then as an individual closely approaching advanced age, pursuant to 20 C.F.R. § 404.1563 (c) and (d). The relevant period for consideration of disability is March 8, 2003, Karl-Lebrenz's alleged onset date, through December 31, 2007, her date last insured for

Social Security disability benefits ("DLI") pursuant to 20 C.F.R. § 404.130 (a). Her highest level of education, an associate degree in nursing, was attained in December of 1981. [149.]

Karl-Lebrenz began her past relevant work as a rural route mail carrier for the United States Postal Service ("USPS") in 1993. [167.] She held this job until March 1, 1999, when she was involved in a motor vehicle accident while working. [637.] After her accident, Karl-Lebrenz returned to work in a reduced capacity until October 3, 2001, when she underwent spinal surgery. [168.] She returned to work in a reduced capacity at USPS as a supervisor at first, and then as an administrative assistant for four hours per day, from June 18 until August 12, 2002. [143.]

On March 4, 1999, shortly after her motor vehicle accident, Karl-Lebrenz was examined by Rajnikant Patel, M.D. [289.] She complained of pain in her neck, radiating to her upper back, head, and down her arms. Karl-Lebrenz claimed that the pain had increased since the accident, and upon examination Dr. Patel noted tenderness over the cervical spine and a limited range of motion in her neck. [289.]

On October 3, 2001, Edward Simmons, M.D., performed spinal surgery on Karl-Lebrenz. She underwent a complete anterior discectomy at C5-C6 and C6-C7, a partial anterior vertebrectomy of C6, an anterior keystone fusion from C5-C7 with autologous bone graft taken from her right anterior iliac crest, and anterior spinal concepts plate fixation from C5-C7. [403.]

On August 9, 2002, Karl-Lebrenz was examined by Dr. Patel. Dr. Patel noted that Karl-Lebrenz was very tearful on examination, and that she was having a lot of pain as a result of her motor vehicle accident and subsequent surgery. She opined that her pain was exacerbated by work-related stress, and Dr. Patel informed her that chronic pain often leads to depression. In a follow-up appointment on September 4, Dr. Patel referred Karl-Lebrenz for psychiatric

4

treatment. [271.] Dr. Patel's treatment notes for several examinations in 2005 and 2006 note clinical impressions of depression and ADHD. [262-267.]

At an appointment with Jan Hendryx, D.O., on August 15, 2002, Karl-Lebrenz reported that she was misplacing objects and suffering from other memory problems, both at home and at work. She again reported difficulty dealing with work-related stress. Upon examination, Dr. Hendryx noted she had pain in her cervical and thoracic spinal regions. [459.]

On February 10, 2003, Dr. Simmons met with Karl-Lebrenz for a follow-up appointment. Karl-Lebrenz reported increasing pain at the base of her neck and upper and mid-thoracic areas, radiating into both arms. She further reported numbness and tingling in this distribution, along with a hyperesthesia to light touch. She indicated that she had difficulty wearing clothes over this area, because even a light touch was aggravating. Upon examination, Dr. Simmons found Karl-Lebrenz had tenderness to palpation over the C7 to T4 area, along with paraspinal muscle spasms and a reduced range of motion in her neck. Dr. Simmons concluded that Karl-Lebrenz's condition had deteriorated to such a degree that she had a total disability with regards to all work, and that physical therapy and pain management were necessary to prevent further deterioration. At the time of the examination, Karl-Lebrenz's insurance carrier had not approved any physical therapy or pain management. [402.]

On April 8, 2003, Dr. Hendryx examined Karl-Lebrenz and noted that she had been experiencing migraines. [523.] After seeing her again on April 29, Dr. Hendryx noted Karl-Lebrenz had tender points in the mid-thoracic area, as well as pain travelling up her cervical spine and into her head, to the right temple and eye. He noted decreased muscle tone in the upper trapezii as well as spasms, and further noted the presence of spasms and tightness in the lower cervical paraspinals. [521.]

On June 30, 2003, Karl-Lebrenz was again examined by Dr. Hendryx. She was experiencing burning pain and a tingling sensation in her cervical and thoracic spine, radiating down her right arm into the fingers and thumb of her right hand. Karl-Lebrenz reported that she had been dropping things with her right hand and Dr. Hendryx described her hand as "weaker overall." Once again it was noted that stress seemed to increase her pain, and she reported difficulty driving or riding in a car. Karl-Lebrenz reported that she had been experiencing headaches with pain around her eyes, associated dizziness, photophobia, and hypersensitivity, and that these headaches could persist for half of a day. She also notified Dr. Hendryx that she had been feeling depressed and that her psychiatrist, Dr. Saha, intended to increase her psychiatric medication. [535-536.]

Upon examination on October 16, 2003, Dr. Hendryx noted that Karl-Lebrenz had moderate edema over the cervical and thoracic junction, tender points, and tenderness on palpation, which was greater on the right side. Her deep tendon reflexes were 2/4 in both upper extremities. [530-531.]

On April 22, 2004, Dr. Hendryx noted that Karl-Lebrenz was waking up in the morning with a throbbing pain radiating from her cervical and thoracic spinal regions into her shoulders and head. [528.]

On September 9, 2005, Dr. Hendryx completed an injury compensation report, stating that Karl-Lebrenz had been diagnosed with depression and neck pain. In this report, Dr. Hendryx indicated that Karl-Lebrenz had a poor prognosis for full recovery, and that she was at or nearing maximum medical improvement from a rehabilitative standpoint. He suggested that the depression could best be addressed by Karl-Lebrenz's psychiatrist, Dr. Saha. [539.]

On January 6, 2006, Dr. Patel examined Karl-Lebrenz. He made note of increased neck pain, radiating into Karl-Lebrenz's right upper extremity and into her head, as well as muscle spasms. Dr. Patel indicated that Karl-Lebrenz's symptoms were affected by weather changes. He noted that her affect was depressed, and that his impression was that Karl-Lebrenz suffered from chronic lower back pain, depression, ADHD, and headache. [264.]

On July 18, 2006, Karl-Lebrenz was examined by Dr. Hendryx. He noted that she had been seeing a psychologist and psychiatrist, Dr. Raja Rao, for her depression. On examination, Karl-Lebrenz had a blunted affect and continued to experience pain in her neck and mid-to-upper back. [549.]

On August 18, 2006, Dr. Hendryx noted that Karl-Lebrenz had been experiencing increased pain in her upper back, radiating around her jaw and chin. He indicated that she received temporary relief from acupuncture treatments, and that she had a blunt affect and tenderness upon examination. [548.] On the same date, Dr. Hendryx filled out a work capacity evaluation for the U.S. Department of Labor, in which he opined that Karl-Lebrenz could lift 1-10 pounds; walk, stand, and sit for 3.5 hours per day; operate a motor vehicle at work for 3.5 hours per day; operate a motor vehicle to and from work for 0.5-1 hour per day; perform repetitive movements of the wrists and elbows for 1-2 hours per day; bend and stoop for 0-1 hours per day; and that she was unable to perform activities which involved reaching, pushing, pulling, or twisting. He concluded that Karl-Lebrenz could work for a maximum of 3.5-4 hours per day, and that she required a 15-minute break every hour. [570.]

On November 21, 2006, Dr. Hendryx noted that Karl-Lebrenz continued to experience pain in her mid- to upper back, neck, and lower scapular area. She continued to present as depressed, with a blunted affect, and opined that she should remain off work. [571.]

On April 20, 2007, Dr. Hendryx noted increased pain in Karl-Lebrenz's upper thoracic region and ribs. She had mild edema of the cervical spine and tenderness to palpation. Dr. Hendryx also noted that her affect was blunted, and instructed her to remain off work. [576.]

On July 27, 2007, Dr. Hendryx noted that Karl-Lebrenz was in "a lot of pain." She had pain in her upper trapezius and shoulders, up the side of her neck, and into her head, intermittently radiating down her right arm. She attained some partial relief from various forms of treatment, including yoga, massage therapy, and biofreeze. She described her pain as 5/10 or 6/10 on a good day, and 8/10 on a bad day, and claimed it was exacerbated by cold and damp weather, heavy clothing, and stress. Karl-Lebrenz indicated that she was treating her depression with a psychologist, Dr. Storms. [580.] On examination, Dr. Hendryx noted that Karl-Lebrenz had a decreased range of motion and deep tendon reflexes of 2/4. Her right handgrip and bicep strength were decreased to 4/5, and she had decreased muscle tone. [582.]

On October 16, 2007, Dr. Hendryx noted that Karl-Lebrenz had an increase in neck pain, as well as pain in her right shoulder and right arm. He also indicated that she had been experiencing some left lower back pain in the weeks preceding the appointment. [586.]

On November 15, 2007, Karl-Lebrenz indicated an increase in upper back and neck pain to Dr. Hendryx, which coincided with an increase in stress and depression symptoms. She also reported a tingling and itching sensation in both palms. Dr. Hendryx noted that her affect was blunted, and instructed Karl-Lebrenz to remain off work. [588.]

On December 21, 2007, Karl-Lebrenz was examined by Dr. Hendryx. Dr. Hendryx noted muscle spasms in the middle and posterior scalene, as well as reduced grip strength of 4/5 and tenderness in the upper trapezius. Karl-Lebrenz was tearful at times during the examination. Dr.

Hendryx assessed that she had neck pain and depression, and he instructed her to remain off work. [590.]

On May 22, 2008, Karl-Lebrenz received a CT scan of her cervical spine. The scan, which was ordered by Leonardo Fugoso, M.D., and interpreted by Bluett Jones, M.D., was limited due to the anterior cervical fusion hardware from C5-C7. The scan showed that the interosseous screws at C5 extended beyond the posterior end plate of the vertebral body of the thecal canal. Dr. Jones reported that without intrathecal contrast, which was not used for this scan, it was difficult to evaluate the screws' encroachment on the spinal cord. Dr. Jones reported apparent fusion at C5, C6, and C7, some loss of intervertebral space at C4-C5, and a slight reversal of the curve at the C4-C5 level. Dr. Jones also noted a loss of intervertebral space at C7-T1. Based on the results of the CT scan, Dr. Jones opined that disc herniation in the superior cervical spine was doubtful but could not be ruled out. The lower sections also showed no definite disc herniation, though Dr. Jones noted that small herniations could be overlooked without intrathecal contrast. Dr. Jones indicated that on the soft tissue windows, the screws appeared to encroach on the spinal cord. Consequently, Dr. Jones recommended that Karl-Lebrenz have a CT myelogram to better evaluate the extent to which the screws encroached on the spinal cord, if at all, and to rule out disc herniations. [358-359.]

On August 1, 2008, Dr. Simmons met with Karl-Lebrenz for a consultation. During the consultation, Karl-Lebrenz stated that her neck pain was constant, and she characterized it as a burning sharp pain in the back of her neck, radiating to the bilateral shoulders and extending into the right scapula and down the arms. She informed Dr. Simmons that her symptoms were aggravated by reaching overhead, lifting, driving, and extending her neck, as well as by humid or damp weather. Dr. Simmons noted that Karl-Lebrenz had had minimal improvement with

conservative management other than with acupuncture, massage therapy, and use of Medrol

Dosepak. Dr. Simmons noted that Karl-Lebrenz suffered from swelling in the back of her neck

and spasms in her hands in addition to her neck and back pain. She reported that she dropped

things easily. [399.] Dr. Simmons noted that x-rays of Karl-Lebrenz's cervical spine showed that

her cervical plate was in good position with a solid fusion at C5-C7. He opined that one screw in

the C5 vertebral body extended beyond the cortex, and that there was moderate loss of disc

height at C7-T1. Dr. Simmons further noted minimal loss of disc height at C2-C3, mild loss of

disc height at C4-C5, and no identifiable disc herniation. Based on his observations, Dr.

Simmons opined that Karl-Lebrenz's symptoms were causally related to her motor vehicle

accident in 1999, and that she "has a permanent total disability with regards to her previous type

work and a permanent marked partial disability with regards to all work." [400.]

On October 1, 2008, Karl-Lebrenz's treating psychologist, Tera Storms, Psy.D.,

completed a form regarding her mental health treatment. [369.] Dr. Storms stated that she had

been seeing Karl-Lebrenz twice per month since 2005, with her last exam in September 2008.

[363.] Based on their time together, Dr. Storms diagnosed Karl-Lebrenz with recurrent Major

Depressive disorder, Dysthymic disorder, and ADHD, listing depression, tearfulness, anhedonia,

lack of energy, fatigue, weight gain, powerlessness, agitation, irritability, anxiety, difficulty

sleeping, poor concentration and focus, forgetfulness, and hopelessness as her current symptoms.

[363.] Dr. Storms indicated that Karl-Lebrenz's symptoms were static and chronic, and that her

prognosis did not include partial or full recovery or remission. [364.] When prompted to provide

the dates and results of any special testing performed, such as an EEG or psychometric tests, Dr.

Storms indicated "not medical dr" and "no psych. testing done." [364.] Dr. Storms indicated that

Karl-Lebrenz's symptoms began in 1999, subsequent to her work injuries. [365.] In her mental

status evaluation, Dr. Storms indicated that Karl-Lebrenz had a negative attitude, but her appearance and behavior were within normal limits; Karl-Lebrenz's speech was logical and coherent, despite occasional cognitive distortions, her thoughts were primarily rational, and her perception was reality-based and rational; Dr. Storms noted that Karl-Lebrenz's affect was mostly flat, and that she was tearful, overwhelmed, and was easily agitated. [366.] When prompted to evaluate Karl-Lebrenz's sensorium and intellectual functions, Dr. Storms noted that she was oriented to person, place, time, and situation, that her capacity to retain information was within normal limits, and that her ability to perform calculations and serial sevens was "ok"; she noted that Karl-Lebrenz's attention and concentration were very poor, that her memory was moderately impaired, and that her insight and judgment were mildly impaired, and poor at times. [366.] Dr. Storms opined that Karl-Lebrenz was able to perform all activities of daily living independently, but slowly, and declined to comment on her ability to function in a work setting because she had not worked since beginning treatment with Dr. Storms. When asked for a medical opinion regarding Karl-Lebrenz's ability to do work related mental activities, Dr. Storms opined that Karl-Lebrenz would not be able to work in the future. [367.] Additionally, Dr. Storms indicated that Karl-Lebrenz's memory and capacity for sustained concentration and persistence were moderately impaired, but that she had no limitations regarding social interaction or adaption. [368.]

On November 4, 2008, Karl-Lebrenz's treating psychiatrist, Dr. Raja Rao, completed a medical treating source statement. [394.] Dr. Rao opined that Karl-Lebrenz had a "fair" capacity for each of the listed mental abilities. "Fair" was defined as:

> Substantial loss of ability to perform the named activity in regular, competitive employment and, at best, could do so only in a sheltered work setting where special considerations and attention are provided.

[392.] The abilities which Dr. Rao indicated Karl-Lebrenz had a fair capacity for are: the ability to remember work-like procedures; the ability to understand and remember very short and simple instructions; the ability to carry out very short and simple instructions; the ability to maintain attention for extended periods of 2-hour segments; the ability to maintain regular attendance and be punctual within customary tolerances; the ability to sustain an ordinary routine without special supervision; the ability to work in coordination with or proximity to others without being unduly distracted by them; the ability to make simple work-related decisions; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; the ability to ask simple questions or request assistance; the ability to accept instructions and respond appropriately to criticism from supervisors; the ability to get along with coworkers or peers without unduly distracting them or exhibiting behavioral extremes; the ability to respond appropriately to changes in a routine work setting; and the ability to be aware of normal hazards and take appropriate precautions. [392-393.] Dr. Rao further opined that most of Karl-Lebrenz's psychiatric symptoms were secondary to her pain, and that the limitations he listed had persisted at least since March 8, 2003. [394.]

On December 21, 2008, Dr. Hendryx submitted a letter describing his treatment relationship with Karl-Lebrenz. [637.] He stated that Karl-Lebrenz first presented for treatment on January 3, 2002, with complaints of constant neck, thoracic, low back, right hip, and right upper extremity pain which began as a result of a motor vehicle accident on March 1, 1999. [637.] Dr. Hendryx reported that Karl-Lebrenz saw him approximately once a month for exacerbation of pain in her neck, upper trapezius region, and upper thoracic region, radiating down her right upper extremity, which she described as burning. [638.] Dr. Hendryx noted that

12

Karl-Lebrenz complained of intermittent weakness in her right hand, causing her to drop things, and that she had trouble lifting her arms above her shoulders. She also told Dr. Hendryx that her neck got progressively weaker throughout the day, and that by the end of the day, she had trouble holding her head up. [638.] Based on his treatment of Karl-Lebrenz, Dr. Hendryx diagnosed her with neck pain, chronic pain due to trauma, cervical radicular pain in the right upper extremity, status post-operative cervical fusion, cervical and thoracic somatic dysfunction, and major depression. [639.] He opined that Karl-Lebrenz had reached maximum medical improvement from a physical rehabilitative standpoint, and that her pain symptoms were static and permanent. [639.] Dr. Hendryx further opined that Karl-Lebrenz should avoid pushing, pulling, and climbing; that she could lift or carry no more than 10 pounds; that she could walk, stand, or sit for up to 3.5 hours; that stooping and bending should be limited to 0-1 hour; and that bus travel, personal driving, and commercial driving should be limited to 2 hours. He explained that these restrictions had been in place since he began treating Karl-Lebrenz, and that he expected them to be in force permanently. [639.] Dr. Hendryx also noted that Karl-Lebrenz's pain would be aggravated by repetitive motion of her hands, wrists, or elbows, and that she would be unable to return to her previous job or to do "anything that requires significant physical activity for any longer than a few hours," recommending that she remain off work indefinitely. [414.]

On September 10, 2010, Dr. Storms completed the same treating source statement form that Dr. Rao had completed on November 4, 2008. [455.] Dr. Storms indicated that Karl-Lebrenz had only a "fair" ability, as defined above, to maintain attention for extended periods of 2 hour segments, to sustain an ordinary routine without supervision, to work in coordination with or proximity to others without being unduly distracted by them, to complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a

consistent pace without an unreasonable number and length of rest periods, and to accept

instructions and respond appropriately to criticism from supervisors. [453-454.] Dr. Storms

opined that Karl-Lebrenz had chronic conditions of major depression, dysthymia, anxiety, and

ADHD, as well as difficulty with mood stability across time and with constructive, sustained

cognition. Dr. Storms indicated that her assessment was based on four years of treatment, and

that it was her opinion that Karl-Lebrenz had had these limitations since at least March 8, 2003.

[455.]

## III.   DISCUSSION

### A. *Standard of Review Generally*

The only issue to be determined by this Court is whether or not the ALJ's decision that

Karl-Lebrenz was not disabled is supported by substantial evidence. *See* 42 U.S.C. § 405(g);

*Rivera v. Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991). Substantial evidence is defined as "more

than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

For the purposes of determining Social Security disability insurance benefits, a person is

disabled if she is unable "to engage in any substantial gainful activity by reason of any medically

determinable physical or mental impairment which can be expected to result in death or which

has lasted or can be expected to last for a continuous period of not less than 12 months." 42

U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A).

An individual will only be found to have such a disability if her "physical or mental

impairment or impairments are of such severity that [he or she] is not only unable to do [his or

her] previous work but cannot, considering [his or her] age, education, and work experience,

14

engage in any other kind of substantial gainful work which exists in the national economy…." 42 U.S.C. §§ 423(d) (2)(A) & 1382c(a)(3)(B).

The initial burden of showing that her impairment prevents her from returning to her previous type of employment falls on Karl-Lebrenz. *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982). Once this burden has been met, "the burden shifts to the [Commissioner] to prove the existence of alternative substantial gainful work which exists in the national economy and which the claimant could perform." *Id.*; *see also Dumas v. Schweiker*, 712 F.2d 1545, 1551 (2d Cir. 1983); *Parker v. Harris*, 626 F.2d 225, 231 (2d Cir. 1980).

To determine whether a plaintiff is disabled, an ALJ must employ a five-step inquiry:

1.  Whether the plaintiff is currently working;

2.  Whether the plaintiff suffers from a severe impairment;

3.  Whether the impairment is listed in Appendix 1 of the relevant regulations;

4.  Whether the impairment prevents the plaintiff from continuing her past relevant work; and

5.  Whether the impairment prevents the plaintiff from doing any kind of work.

20 C.F.R. §§ 404.1520 & 416.920; *Berry, supra*, 675 F.2d at 467. If a plaintiff is either found to be disabled or not disabled at any step in this five-step inquiry, the ALJ's review ends. 20 C.F.R. §§ 404.1520(a) & 416.920(a); *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). The ALJ, however, has an affirmative duty to develop the record. *Gold v. Secretary*, 463 F.2d 38, 43 (2d Cir. 1972).

To determine whether an admitted impairment prevents a plaintiff from performing her past work, the ALJ is required to review the plaintiff's residual functional capacity and the physical and mental requirements of the work she has done in the past. 20 C.F.R. §§ 404.1520(e)

& 416.920(e). The ALJ must then determine the individual's ability to return to her past relevant work in light of her residual functional capacity. *Washington v. Shalala*, 37 F.3d 1437, 1442 (10th Cir. 1994).

## B. *Step One*

The first step of the five-step inquiry does not require much discussion. Both sides agree that Karl-Lebrenz was not engaged in substantial gainful activity from the alleged onset date, March 8, 2003, through the DLI, December 31, 2007. The Court, therefore, finds that substantial evidence supports the ALJ's findings for the first step.

## C. *Step Two*

Karl-Lebrenz and the Commissioner diverge at the second step. Although the ALJ determined that Karl-Lebrenz had cervical and thoracic pain, status post surgery, each constituting a severe impairment pursuant to 20 CFR 404.1520(c), Karl-Lebrenz argues that the ALJ erred in determining that her mental impairments were not severe. An impairment is not severe if it "is a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on the individual's physical or mental ability(ies) to perform basic work activities." *See* CFR § 404.1521; SSR 86-8; SSR 85-28.

The administrative record contains testimony from two treating mental health sources, Dr. Storms and Dr. Rao. In 2008, Dr. Rao indicated that, though Karl-Lebrenz's psychological impairments were secondary to her physical limitations, they had more than a minimal effect on her ability to perform basic work activities. [392-394.] In 2010, Dr. Storms made note of similar limitations due to Karl-Lebrenz's psychological impairments. [453-455.] Despite the fact that both of these evaluations were made after the DLI, the opinions are clearly related to the period of adjudication and therefore cannot be immediately dismissed.

16

In his decision, the ALJ made no reference to Dr. Rao or his opinions. The federal regulations require an ALJ to evaluate every medical opinion. 20 C.F.R. § 404.1527(c); *see also* SSR 96-2p. The Second Circuit has held that failure to provide good reasons for not crediting the opinion of a claimant's treating physician is ground for remand. *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999). Even if it were the case that the ALJ correctly rejected Dr. Rao's opinion, no explanation was given in his decision for doing so, and the Court "may not accept appellate counsel's *post hoc* rationalization for agency action." *Id.* (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, (1962)); *NLRB v. Kentucky River Community Care, Inc.*, 532 U.S. 706, 715 n.1, n.1 (2001).

In his decision, the ALJ provides two reasons for giving little weight to Dr. Storms' opinion: he had no associated clinical notes to support her opinion, and Dr. Storms opined that Karl-Lebrenz had been at the same level of dysfunction for more than three years before she began treating her. [17.] The Second Circuit held that an ALJ is obligated to complete the record, even if the claimant has representation. *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999). The Court stated:

> In fact, where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history "even when the claimant is represented by counsel or … by a paralegal." *Perez*, 77 F.3d at 47; see also *Pratts*, 94 F.3d at 37 ("It is the rule in our circuit that 'the ALJ, unlike a judge in a trial, must [her]self affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits proceeding.' This duty … exists even when … the claimant is represented by counsel.")

*Rosa*, 168 F.3d at 79.[2] During the hearing in the instant case, the ALJ was informed that Dr. Storms would not release her office notes without a subpoena. [39-40.] The regulations state:

> When it is reasonably necessary for the full presentation of a case, an administrative law judge or a member of the Appeals Council may, on his or her own initiative or at the request of a party, issue subpoenas for the appearance and

---

[2] Citing *Perez v. Chater*, 77 F.3d 41, 47 (2d Cir. 1996); and *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996).

testimony of witnesses and for the production of books, records, correspondence, papers, or other documents that are material to an issue at the hearing.

20 C.F.R. § 404.950(d)(1). In light of this, the ALJ's first reason for giving little weight to Dr. Storms' opinion is inadequate. The Social Security Act recognizes a "treating physician" rule, entitling deference to the opinions of treating sources, including but not limited to medical doctors and psychologists. CFR § 404.1502. Act regulations state that a treating source's opinion regarding the nature and severity of an impairment will be given "controlling weight" if the opinion is well supported by medically acceptable evidence and is not inconsistent with the other substantial evidence in the case record. *Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003). An ALJ may not, as in the instant case, arbitrarily substitute his own judgment for competent medical opinion. *McBrayer v. Sec. Health and Human Svs.*, 712 F.2d 795, 799 (2d Cir. 1983). If the ALJ found that Dr. Storms' opinion was unfounded without her treatment notes, then the lack of notes constituted a deficiency in the record. If there was a deficiency in the record, then the ALJ had an affirmative obligation to complete it, either by issuing a subpoena or by ordering a consultative exam. Lending his own opinion more weight than Dr. Storms or Dr. Rao constitutes legal error, and it is grounds for remand.

The Commissioner asserts in her response to Karl-Lebrenz's memorandum of law (Dkt. No. 16) that the ALJ correctly applied the "special technique" laid out at 20 C.F.R. § 404.1520a for evaluating the severity of mental impairments. *See Kohler v. Astrue*, 546 F.3d 260, 265-266 (2d Cir. 2008). This argument is unavailing. The "special technique" set forth in the regulations requires an ALJ to evaluate a claimant's degree of functional limitation in four broad categories: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. 20 CFR 404.1520a(c) (3). If the degree of limitation in the first three functional areas is rated as "none" or "mild" and the fourth is rated "none," the

federal regulations state that the impairment or impairments in question will generally be found not severe, unless the evidence indicates that there is more than a minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. § 404.1520a(d)(1).

In the instant matter, the ALJ discussed his application of the "special technique" in his decision. [17.] His finding that Karl-Lebrenz had a mild limitation in activities of daily living is supported by substantial evidence. Dr. Storms noted that Karl-Lebrenz is able to do all activities of daily living, but that she performs them slowly due to chronic pain and psychological symptoms. [367.] The ALJ next found that Karl-Lebrenz had only a mild limitation in the area of social functioning because she "is able to get along with others. She goes shopping. She is able to go out alone." [17.] The record contains little evidence suggesting more than a mild limitation in this area.

The ALJ also found that Karl-Lebrenz had only a mild limitation in the third functional area, concentration, persistence, or pace. [17.] This finding conflicts with the assessments of Karl-Lebrenz's only two treating psychological sources, Dr. Storms and Dr. Rao, both of whom indicated at least moderate limitations. [392-394, 453-455.] Though the opinions of treating sources are not necessarily binding, the administrative record contains no evidence which contradicts the assessments of Dr. Storms and Dr. Rao. If the record contained insufficient evidence to contradict or to support the opinions of Dr. Storms and Dr. Rao, then there was an obvious deficiency in the medical record with regards to Karl-Lebrenz's psychological wellbeing. As previously stated, an ALJ has an affirmative obligation to develop the record where there are deficiencies. *Rosa*, 168 F.3d at 79.

The Commissioner further claims that no error was made at step two because the ALJ neither erred by giving little weight to Dr. Storms' opinion nor by failing to subpoena Dr.

Storms' records. Specifically, the Commissioner notes that Dr. Storms acknowledged that she had conducted no psychological testing. The report referenced does not, however, say that no psychological testing was done. When prompted to "[p]lease provide the dates and results of any special testing performed (EEG, psychometric tests, etc.) as well as any information you may have concerning other medical impairments," Dr. Storms replied "not medical dr" and "no psych. testing done." [364.] Though the prompt is subject to interpretation, Dr. Storms' responses suggest that because she was not a medical doctor, she conducted no psychiatric testing. Later in the same report, under "Mental Status," Dr. Storms noted that "ability to perform calculations, serial sevens, etc." was "ok." [366.] The regulations, in explaining the functional category of concentration, persistence or pace, specifically state that "[o]n mental status examinations, concentration is assessed by tasks such as having you subtract serial sevens or serial threes from 100." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00(C)(3). Dr. Storms' indication that Karl-Lebrenz's "ability to perform calculations, serial sevens, etc." was "ok" suggests that she did test Karl-Lebrenz's ability to subtract serial sevens from 100 or performed some equivalent mental status examination. [366.] Dr. Storms' indication that she conducted no psychiatric testing does not, therefore, preclude her testimony. Her indication that she assessed Karl-Lebrenz's ability to perform serial sevens suggests that some psychological examination or testing was conducted, and therefore her notes at least have the potential to substantiate her opinion.

Because Karl-Lebrenz had only two treating mental health sources, and neither of them provided an opinion which was substantially contradicted by the medical record, the ALJ was required to either give their opinions controlling weight or develop the record further. Instead, the ALJ rejected the opinions of both Dr. Storms and Dr. Rao, substituting his opinion at step

two of the five-step inquiry and deciding that Karl-Lebrenz has no severe mental impairments.

By adopting the ALJ's decision, the Commissioner committed a legal error. This case must

therefore be remanded back to the agency for further consideration.

### D. *Step Three and Listing 1.04A*

Karl-Lebrenz and the Commissioner disagree again at step three, but a procedural issue

must be addressed before any resolution can be reached. The relevant listing, 1.04A, covers

disorders of the spine resulting in compromise of a nerve root or the spinal cord. It requires the

following:

> Evidence of nerve root compression characterized by neuro-anatomic distribution
> of pain, limitation of motion of the spine, motor loss (atrophy with associated
> muscle weakness or muscle weakness) accompanied by sensory or reflex loss and,
> if there is involvement of the lower back, positive strait-leg raising test (sitting
> and supine);

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.04A.

In his decision, the ALJ correctly noted the lack of medical evidence from the period of

adjudication. [19.] The ALJ first noted this issue during the November 3, 2010 hearing, when he

said: "I note there are only three Exhibits in the file that cover that period." [39.] Specifically, the

ALJ was not provided with Dr. Hendryx's treatment notes at the time of the hearing. Near the

end of the hearing, the following exchange took place between Karl-Lebrenz's attorney, Lynn

Kwon, and the ALJ:

> ATTY:      I just wanted to request a little bit of time to get the rest of Dr.
> Hendricks' records. They are in a storage facility, because it was from long ago
> and apparently it is not part of their priorities, but I can, I will even drive there, if
> needed.
>
> ALJ:       Okay. I think those are critical, because of the [INAUDIBLE] DLI.
>
> ATTY:      Yes.

ALJ:        So, if you can supply those as quickly as possible and let my office know that you sent those in.

ATTY:       I will let you know.

ALJ:        And, then I can look at those.

ATTY:       Yes.

ALJ:        Okay.

ATTY:       But, other than that, nothing further.

ALJ:        Okay. So, I will put the case in place for two weeks and we will see what we can get here in that time. And, if you are having trouble and you think that there is relevant material out there, let me know, please. And, we will see what we can do from this end.

[59-60.] Shortly thereafter, the ALJ concluded the hearing, saying: "I will wait for those records and then probably issue a written decision that you will get a copy of [.]" [60.]

Although the record suggests that the Commissioner eventually received the records, possibly during Appeals Council review, the records never reached the ALJ. The Appeals Council indicated as much. [4.] Without Dr. Hendryx's records, the ALJ had little medical evidence on which to base his decision. This constitutes a significant deficiency in the record. Whether or not Karl-Lebrenz's attorney failed to follow-up with the agency regarding these records, the ALJ appears from this Court's reading of the record to have committed himself to obtaining Dr. Hendryx's records. Based on the lack of medical records from the period of adjudication and the ALJ's comments at the hearing that Dr. Hendryx's records were "critical," that he would "see what we can do from this end," and that he would "wait for those records," he should have either reviewed the records or at least made note of why they were not obtained. *See Murphy v. Sec. of Health and Human Svs.*, 872 F. Supp. 1153, 1159-1160 (E.D.N.Y.1994).

In his decision, the ALJ references a report that Dr. Hendryx completed on December 21, 2008, stating that he gave little weight to Dr. Hendryx's opinion because it is outside the period at issue and because it is illogical. [20.] The ALJ made no mention of the records which he had previously described as "critical" during the hearing. With regards to the ALJ's first reason for giving little weight to Dr. Hendryx's opinion, the ALJ noted that Karl-Lebrenz had been under the care of Dr. Hendryx from 2002 through her DLI and beyond. [20.] Dr. Hendryx's opinion should not have been devalued for falling outside the period at issue because the ALJ was aware of evidence from Dr. Hendryx which spanned the entire period at issue. The ALJ's failure to obtain Dr. Hendryx's relevant records does not discredit Dr. Hendryx's opinion as a treating source.

The ALJ's second reason for giving little weight to Dr. Hendryx's opinion, that it is illogical, is also inadequate. The ALJ suggests in his decision that it is inconsistent to assert that Karl-Lebrenz has the physical capacity for 3.5 hours of walking, sitting, or standing and 2 hours each of bus travel, personal driving, and commercial driving while claiming that she can do zero hours of work per day. [20.] Based solely on those restrictions, a conclusion that Karl-Lebrenz could not work at all lacks support, though it is not illogical or internally inconsistent. The records which the ALJ requested at the hearing and never obtained clarify and support Dr. Hendryx's conclusion. In a report dated August 18, 2006, which is within the period at issue, Dr. Hendryx stated that in addition to the limitations referenced in the ALJ's decision, Karl-Lebrenz would require a 15-minute break every hour, and she could only work 3.5-4 hours per day. [570.] Furthermore, the report from Dr. Hendryx that the ALJ referenced in his decision lists "depression" as one of Karl-Lebrenz's diagnoses. [413.] This indicates that Dr. Hendryx was aware of Karl-Lebrenz's comorbid psychological impairments, and it has been established that

an individual can be found disabled based upon a combination of exertional and non-exertional limitations or non-exertional limitations alone. *See* SSR 85-15; 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00. It is therefore neither illogical nor internally inconsistent to assert that an individual cannot work, even if her exertional limitations alone would not preclude her from substantial gainful activity.

The ALJ decided that Karl-Lebrenz was not disabled *per se* at step three after noting the lack of medical evidence from the relevant period. [19.] Notably, the ALJ reached this conclusion without consulting Dr. Hendryx's records which he himself had described as "critical." The ALJ's decision at step three is therefore not supported by substantial evidence, and by adopting it the Commissioner committed a legal error. This Court therefore recommends remanding this case back to the agency for further consideration.

## E. *Steps Four and Five, and Residual Functional Capacity*

At step four of the five-step inquiry, the parties are agreed that Karl-Lebrenz is not capable of returning to her past relevant work as a mail carrier. There is disagreement, however, over the ALJ's residual functional capacity finding. The ALJ found that Karl-Lebrenz had the residual functional capacity to perform the full range of light work as defined in 20 C.F.R. 404.1567(b). [18.] Karl-Lebrenz argues in her memorandum of law in support of her motion for judgment on the pleadings (Dkt. No. 13) that the record lacks evidentiary support for this finding. The Regulations define light work as follows:

> Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities….

20 C.F.R 404.1567(b). To support his decision, the ALJ notes that at the hearing, Karl-Lebrenz stated that she could not lift more than 35 pounds. [19, 45.] He neglects to mention, however, that later in the same hearing, he asked Karl-Lebrenz if she could have lifted up to ten pounds frequently on or before December 31, 2007, to which she replied "not frequently" due to pain. [55.] The only other evidence the ALJ cited regarding how much weight Karl-Lebrenz could lift was Dr. Hendryx's report dated December 21, 2008. [20.] As the ALJ notes, Dr. Hendryx opined in this report that Karl-Lebrenz could lift a maximum weight of 10 pounds. [20, 413.]

SSR 96-8p explains the Social Security Administration's policies regarding the assessment of residual functional capacity. The list of purposes for the ruling includes the following:

> 4. The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 C.F.R. 404.1545 and 416.945. Only after that may RFC be expressed in terms of the exertional levels of work, sedentary, light, medium, heavy, and very heavy.

Social Security Ruling 96-8p, 1996 SSR LEXIS 5, 1996 WL 374184. Specifically, and relevant to the instant matter, the physical abilities this ruling refers to are sitting, standing, walking, lifting, carrying, pushing, pulling, reaching, handling, stooping, and crouching. 20 C.F.R 404.1545(b); 20 C.F.R. 416.945(b). Additionally, the mental abilities referred to by SSR 96-8p are "limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, coworkers, and work pressures in a work setting." 20 C.F.R 404.1545(c); 20 C.F.R. 416.945(c). Based on the ALJ's decision, it is unclear what opinions he relied on when determining Karl-Lebrenz's residual functional capacity. In defending his residual functional capacity finding, the ALJ made no mention of Karl-Lebrenz's limitations with respect to the mental abilities listed above. [18-20.] The only mention of the physical

abilities listed above is in reference to a Function Report completed by Karl-Lebrenz and a report from Dr. Hendryx. [19, 20.] The ALJ fails to mention any specific limitations drawn from the Function Report. [19.] The ALJ notes that Dr. Hendryx opined that Karl-Lebrenz could lift or carry up to 10 pounds; walk, stand, and sit for up to 3.5 hours per day; stoop or bend for 0-1 hour per day; that she should avoid pushing, pulling, and climbing; and that she was "unable to return to her previous job, anything that requires significant physical activity for any longer than a few hours." [20.]

Dr. Hendryx's report provides the only thing resembling a function-by-function assessment of Karl-Lebrenz's ability to perform the exertional demands of light work. [20.] The ALJ's residual functional capacity determination, which includes an ability to lift up to 20 pounds, directly contradicts Dr. Hendryx's findings, which include a 10 pound limit for lifting and carrying. [18, 20.] It is well established in this District that an ALJ commits legal error, requiring remand, when, as in this case, he fails to clearly cite which opinions he relied upon when determining a claimant's residual functional capacity, and when he fails to provide a function-by-function assessment of the claimant's ability to perform the exertional demands of a given level of work. *Hogan v. Astrue*, 491 F. Supp. 2d 347, 354 (W.D.N.Y., 2007); *Pronti v. Barnhart*, 339 F. Supp. 2d 480, 490 (W.D.N.Y. 2004). It is worth noting that an ALJ's failure to provide a function-by-function analysis of a claimant's residual functional capacity alone does not mandate remand, so long as the residual functional capacity is otherwise supported by substantial evidence. *Diakogiannis v. Astrue*, 975 F. Supp. 2d 299, 313 (W.D.N.Y. 2013). The Second Circuit has recently ruled on this issue, stating the following:

> Where an ALJ's analysis at Step Four regarding a claimant's functional limitations and restrictions affords an adequate basis for meaningful judicial review, applies the proper legal standards, and is supported by substantial evidence such that additional analysis would be unnecessary or superfluous, we

agree with our sister Circuits that remand is not necessary merely because an explicit function-by-function analysis was not performed.

*Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013). In this case, the ALJ's residual functional capacity assessment not only lacks an explicit function-by-function analysis; the ALJ's decision fails to state the basis for his residual functional capacity finding in a sufficiently clear manner for judicial review, and it does not appear to be supported by substantial evidence in the record.

Karl-Lebrenz has also argued that the ALJ erred by following the Medical-Vocational Guidelines ("the grids") because the grids are insufficient where a claimant has non-exertional impairments. The Second Circuit has held that application of the grids must be determined on a case-by-case basis. That being said, the Second Circuit has held that application of the grids is inappropriate "where the claimant's work capacity is significantly diminished beyond that caused by his exertional impairment." *Bapp v. Bowen*, 802 F.2d 601, 605-606 (2d Cir. 1986). Based on the ALJ's finding that Karl-Lebrenz's non-exertional limitations did not substantially diminish her work capacity beyond her exertional limitations, his reliance on the grids was proper. The ALJ's conclusion regarding the severity of Karl-Lebrenz's non-exertional limitations, however, was not supported by substantial evidence, was based on an incomplete medical record, and was founded upon legal error. Until the record has been completed and an accurate determination of the severity of Karl-Lebrenz's non-exertional limitations has been made, no decision can be made regarding whether or not it is acceptable to rely solely on the grids in this case.

Finally, Karl-Lebrenz argues that the ALJ failed to follow federal regulations in his assessment of Karl-Lebrenz's credibility. In his decision, the ALJ stated the following:

> After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity,

persistence and limiting effects of these symptoms are not credible to the extent
they are inconsistent with the above residual functional capacity assessment.

[19.]

The Second Circuit has held that an ALJ is obligated not only to assess the credibility of
any witness whose testimony he rejects, but that a finding that the witness is not credible must
"be set forth with sufficient specificity to permit intelligible plenary review of the record."
*Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 261 (2d Cir. 1988); citing *Carroll v. Secretary
of Health and Human Servs.*, 705 F.2d 638, 643 (2d Cir. 1983). In the instant matter, the ALJ
stated that Karl-Lebrenz's testimony was not credible because her assertions about the intensity,
persistence, and limiting effects of her symptoms were inconsistent with a residual functional
capacity for the full range of light work. [19.] As mentioned previously, this residual functional
capacity is inconsistent with the medical record. If any of Karl-Lebrenz's statements were
contradicted by facts in the medical record, the ALJ failed to reference the contradiction in his
decision. His decision that Karl-Lebrenz was not a credible witness is therefore not sufficiently
clear for review, constituting reversible error.

The reasoning for the ALJ's determination that Karl-Lebrenz is capable of the full range
of light work is not sufficiently clear for review. Because this residual functional capacity
contradicts medical evidence which should have been given significant weight, it is not
supported by substantial evidence. By adopting this decision the Commissioner committed a
legal error, and this Court therefore recommends remanding this case for reconsideration.

In recommending remand, the Court takes no position at this time as to the ultimate issue
of disability. The Commissioner will assess disability on the expanded record in the first
instance. For that reason, the Court recommends denying Karl-Lebrenz any other relief, but
without prejudice to revisit substantive issues after completion of the record.

28

## IV.    CONCLUSION

For all of the foregoing reasons, the Court respectfully recommends granting Karl-Lebrenz's motion (Dkt. No. 12) in part, for the limited purpose of vacating the Commissioner's determination and remanding the case for a full assessment after the medical record has been completed. The Court recommends denying Karl-Lebrenz's motion without prejudice to the extent that it seeks any other relief. The Court further recommends denying the Commissioner's motion (Dkt. No. 11).

## V.    OBJECTIONS

A copy of this Report and Recommendation will be sent to counsel for the parties by electronic filing on the date below. Any objections to this Report and Recommendation must be electronically filed with the clerk of the Court within 14 days. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72. "As a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point." *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (citations omitted).

SO ORDERED.

_/s Hugh B. Scott_____
**HONORABLE HUGH B. SCOTT**
**UNITED STATES MAGISTRATE JUDGE**

DATED: July 18, 2014

29